FILED
10/5/21 2:20 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| MICHAEL K. HERRON, | : | Case No. 19-24527-TPA |
| *Debtor* | : | |
| | : | Chapter 11 |
| MICHAEL K. HERRON, | : | |
| *Plaintiff* | : | Adv. No. 20-02131-TPA |
| | : | |
| v. | : | Related to Doc. No. 6 |
| | : | |
| INTERNAL REVENUE SERVICE, | : | |
| UNITED STATES OF AMERICA, | : | |
| *Defendant* | : | |

## **MEMORANDUM OPINION**

*Appearances:* Aurelius P. Robleto, Esq., for the Plaintiff
Elisabeth Bruce, Esq., for the Defendant
Alexander R. Kalyniuk, Esq., for the Defendant

This adversary proceeding raises a number of issues concerning income tax debt that

the Debtor/Plaintiff (the "Debtor") owes to the Internal Revenue Service of the United States of

America ("IRS") and the associated tax liens asserted by the IRS as affected by the Debtor's

bankruptcy filing. For the reasons that follow the Court generally finds in favor of the IRS with

respect to the disputed issues, although the Debtor will prevail as to his effort to "strip" the IRS tax

lien as to certain individual parcels of real property in which the Debtor lacks equity.[1]

---

[1]

The Court has jurisdiction over this matter pursuant to *28 U.S.C. §1334*. This is a core
matter pursuant to *28 U.S.C. §157(b)(2) (B), (I), (K)*, and *(O)*.

## *PROCEDURAL HISTORY*

Debtor filed a voluntary Chapter 11 case on November 21, 2019. The petition lists the IRS as both a secured creditor and an unsecured creditor. The IRS filed Claim No. 11-1 on February 11, 2020 asserting a secured claim in the amount of $867,570.25 for tax years 2004 through 2008 and 2010 through 2012, and an unsecured claim in the amount of $77,208.70 for tax years 2011 and 2012, resulting in a total claim of $944,778.95.

The Debtor filed the present adversary proceeding on August 31, 2020. The Amended Complaint filed by the Debtor at Doc. No. 6 sets forth 11 separate counts for relief, which may conveniently be broken down into four groups which can be summarized briefly as follows:

| | | |
|---|---|---|
| • | Count I | Seeks to disallow the portion of the claim regarding tax years 2004 through 2008 as being time barred[2] |
| • | Count II | Seeks to avoid certain IRS tax liens on the basis of improper filings involving Notices of Federal Tax Liens by the IRS[3] |
| • | Count III | Seeks a determination that the IRS claim is dischargeable |
| • | Counts IV–XI | Seeks determinations as to the secured status of various individual parcels of real property owned by the Debtor with respect to the IRS tax lien |

---

[2]

Count I also seeks to disallow any claim as to tax year 2003, but the IRS has never pursued a claim as to that year so the Court considers that to be an erroneous part of the Amended Complaint.

[3]

Count II was previously dismissed by the Court prior to trial, *see* Doc. No. 42, and is not discussed further in this Memorandum Opinion.

On September 14, 2020, shortly after the Amended Complaint was filed, the IRS then filed an amended version of its claim, Claim No. 11–2, this time showing a secured claim of $518,691.13 for tax years 2008, 2010, 2011, and 2012, and an unsecured claim of $426,087.82 for tax years 2004, 2005, 2006, 2007, 2011, and 2012, again resulting in a total claim of $944,778.95. The only differences between the original Claim 11–1 and the amended Claim 11–2 is that the secured claims for tax years 2004, 2005, 2006, and 2007 as stated in Claim 11–1 were changed to unsecured claims in Claim 11–2, and the dates of the tax assessment made by the IRS were changed to a later date for some of the individual tax years.

The IRS filed its Answer to the Amended complaint on October 14, 2020 at Doc. No. 9. After the close of discovery the IRS filed a motion for summary judgment on March 5, 2021 at Doc. No. 14. On April 27, 2021 the Court entered an order granting the IRS summary judgment motion in part by dismissing Count II of the Amended Complaint in light of the fact that under amended Claim 11–2 the IRS is no longer asserting a secured claim for tax years 2004 through 2007 (*see* n. 2, above), but in all other respects denied the motion. Trial as to the remaining counts was held on June 21, 2021. Both sides then filed post-trial briefs and proposed findings of fact and conclusions of law, following which time closing arguments were heard.

Running on a parallel track while this adversary proceeding was unfolding was the main bankruptcy case of the Debtor. The Debtor there filed a Second Amended Chapter 11 Plan ("Plan") on December 15, 2020 and an accompanying Disclosure Statement on December 17, 2020. *See,* main case, Doc. Nos. 265, 270. The Plan and Disclosure Statement both made explicit

3

reference to the within adversary proceeding and indicated that through it the Debtor was seeking a determination that would limit the secured claims of the IRS.  *See*, main case Doc. No. 265 at §§ 1.26, 4.6, and Doc. No. 270 at pages 2, 7.  The IRS did not file an objection to either the Plan or Disclosure Statement.  The Plan was confirmed on January 22, 2021.  *See*, main case Doc. No. 311. No appeal was ever taken and the confirmation order is therefore final.

Also, during the course of the adversary proceeding, two of the individual parcels of real property that are at issue herein have been sold by the Debtor pursuant to *11 U.S.C. §363(b)*. In particular, 340 Roup Avenue, Pittsburgh, PA which is the subject of Count V of the Amended Complaint was approved for sale by the Court on November 3, 2020 and was then subsequently sold on December 10, 2020.  *See*, main case Doc. Nos.  181, 232, 263.  Also, 3700 Orpwood Street, Pittsburgh, PA which is the subject of Count IX of the Amended Complaint was approved for sale by the Court on November 3, 2020  and was then subsequently sold on December 4, 2020.  *See*, main case Doc. Nos. 184,  233, 262.  The IRS did not object to either of those sales and it does not appear that any of the sale proceeds were paid to the IRS on its claim.  Thus, Counts V and IX of the Amended Complaint  have effectively become moot.  The sale orders issued by the Court approving the sales of these two properties do include the following provision:

> It is FURTHER ORDERED, that the above recited liens and claims, be, and they hereby are, transferred to the proceeds of sale, if and to the extent they may be determined to be valid liens against the sold property, that the within decreed sale shall be free, clear and divested of said liens and claims;

The resultant effect of such language in the sale order is that the IRS may have a lien interest in any remaining sale proceeds being held by Debtor's Counsel, but that is a matter not raised in the Amended Complaint and not presently before the Court.

Finally, another parcel of real property, 7167 Ross Rd., Pittsburgh, PA involved in Count IV of the adversary, was the subject of a settlement between the Debtor and Bank of America, N.A. that was approved on February 17, 2021 after no objections were filed. *See*, main case Doc. Nos. 303, 328. The settlement appears to recognize that the Debtor actually transferred that property to two other individuals in an arms-length transaction in 2009 and has no current ownership interest in it. The Debtor's counsel commented at the trial that this settlement may render Count IV moot, and the Debtor does not address Count IV at all in his post-trial filings. Hence, the Court will treat Count IV as being moot or withdrawn by the Debtor.

### *FACTUAL FINDINGS*

A recitation of the relevant factual background giving rise to the IRS claim is necessary for a full understanding of the legal issues presented. Debtor is an individual currently residing at 1276 West Tacoma St., Hernando, Florida. He is a physician specializing in radiology and highly educated, with masters degrees in business administration and public administration, in addition to his medical degree. The Debtor is also in the real estate business. As of the date the petition was filed he owned or had an interest in 12 parcels of real estate located in Florida, Pennsylvania, Louisiana and Maryland that he valued cumulatively at approximately $3.5 million.

The Debtor's post-residency medical career as a radiologist began in 2002. In 2006 he and several other partners opened a radiology imaging center. In 2008 the Debtor then opened his own radiology imaging center known as Sugar Mill Diagnostic Imaging, LLC. The "great recession" of 2008 hit shortly thereafter and the Debtor's new imaging business was negatively impacted, but continued in operation.

5

At some point, probably in 2009, the Debtor spoke with his then-accountant, Phil Price, and told Mr. Price that he was going through financial difficulties.[4]  The Debtor testified that Mr. Price raised the possibility of amending the Debtors' prior-years' tax returns as a means of obtaining refunds.  The Debtor, apparently relying on the expertise of Mr. Price, agreed to that suggestion and gave him the authority to "do what you need to do." *Trial Tr.* at 48:16.  The record discloses that the IRS received a "tentative carryback claim" on behalf of Debtor for each of tax years 2004 through 2007 on September 7, 2009 and it issued refunds to the Debtor for each of those years on that same day.  The  refund amounts issued to the Debtor for each of the years was as follows:

- 2004        $  89,264.00   (Exhibit 6 at Bates # 114)
- 2005        $180,033.42   (Exhibit 6 at Bates # 124)
- 2006        $  37,157.00   (Exhibit 6 at Bates # 135)
- 2007        $  38,587.00   (Exhibit 6 at Bates # 146)

The total amount of refunds sent to Debtor for the 2004 through 2007 tax years was thus $345,041.42. Debtor testified that he used these monies for "helping to fund my business, keep my people employed." *Trial Tr.* at 48:19-20.  Amended tax returns for years 2004 through 2007 were then subsequently filed on behalf of Debtor.

The situation with regard to the 2008 tax year was different because no "tentative carryback claim" was ever filed by the Debtor.  The record on the point is unclear, but since the

---

[4]

The Debtor testified at trial to an alternative timeline wherein his discussion with Mr. Price and the resulting tax events would have occurred  somewhere during the period of late 2012 through early 2014 at a time when he had been called back to active duty service with the U.S. Navy. *See Trial Tr.* at 48:03–17, June 22, 2021 at Doc. No. 74.  The Court rejects this testimony because it is inconsistent with the certified tax records submitted by the IRS, and because the Debtor also admitted in his later testimony that he could only pin down the time period to a 4-year range, and was not even sure of that. *Id*. at 73:13–15

original return for tax year 2008 was not filed until August 4, 2009, perhaps that return already incorporated the information that was in the tentative carryback claims that were filed for tax years 2004 through 2007, so such a filing was not needed for 2008.  In any event, the tax records show that a refund of $9,258 for tax year 2008 was sent to the Debtor on August 31, 2009.

Subsequent to the issuance of refunds to the Debtor as outlined above, and the filing of amended tax returns by the Debtor, the IRS further examined the Debtor's returns and concluded that the refunds should not have been made.  Based on that conclusion the IRS then made "supplemental" assessments of tax for the years in question.  This will be addressed further in connection with the legal discussion of Count I of the Amended complaint wherein the Debtor argues that the IRS claim for tax years 2004 through 2008 are time barred.  The tax claims for tax years 2010 through 2012 are secured claims and are not being challenged as time barred by the Debtor.

The record is not entirely clear as to exactly when the Debtor had an awareness that he owed the IRS taxes for the years in question.  At one point the Debtor, under questioning by his attorney, testified as follows:

> Q.    Okay.  Do you believe that — well, when did you first learn of this tax obligation?
>
> A.    Oh, I don't know.  I mean, I think that when all of those refund checks came, I think it took me maybe about year (sic) to maybe 14, 18 months when the IRS started asking for the money back.

*Trial. Tr.* at 56:22– 57:02.  Shortly thereafter the Debtor's attorney attempted to more clearly identify the time period when the Debtor knew he owed taxes and the following exchange occurred:

Q.    So what year was it then that — was it 2014, around perhaps?

A.    I'm going to shoot around  —  it's somewhere in the bracket
      in between 2014 and 2017 timeframe.

*Trial Tr.* at 57:19–22.  That timeframe does not work, however.  Since the refunds were issued in

September 2009, by Debtor's own testimony as quoted above he would have become aware that he

owed taxes by no later than sometime in early 2011.  Furthermore, the Debtor stipulated that as early

as 2012 he was aware that the IRS claimed that he owed outstanding taxes and that there was an IRS

problem he needed to address.  *See*, Doc. No. 37, Stipulated Fact No. 7.  The Court thus finds that

the Debtor had an awareness that he owed taxes to the IRS by 2012, and that any of his acts or

omissions  following that date occurred  with such an awareness on his part.

The Debtor attempted to resolve the tax issue with the IRS by submitting three

"offers-in-compromise" to the IRS through a professional retained by him.[5]  The offers-in-

compromise were apparently rejected by the IRS, though no evidence was presented at trial by either

side concerning the substance of the offers-in-compromise or why they were rejected.  The Debtor

had hired another professional and was in the process of preparing for the filing of a fourth offer-in-

compromise, but he ultimately chose to  drop that effort and instead file the within bankruptcy as

a means of addressing the tax claim issue, among other things.

---

[5]

Debtor testified that when he became aware that the IRS was seeking a recovery against him
he first brought the matter to the attention of Phil Price, the man who had submitted the
documentation on Debtor's behalf that had led to the refunds.  Mr. Price, however, was seriously
ill by then (and subsequently passed away, approximately 3–5 years ago).  Debtor therefore instead
spoke with Price's son "Chuck," who assisted him in one or two of the offers in compromise.  *See
generally Trial Tr.* at 51:03–52:21.  Debtor's testimony was unclear as to who, if anyone, assisted
him with the third offer-in-compromise.

***LEGAL DISCUSSION***

### (A)  Timeliness of the IRS Claim for Tax Years 2004 Through 2008 (Count I)

The Debtor argues that the IRS claims for tax years 2004 through 2008 are untimely and unenforceable, and to that extent objects to the IRS proof of claim.   The Debtor's argument on untimeliness is a simple one.  He notes that there is a general rule that federal income tax claims become unenforceable following the tenth anniversary of the date upon which they are assessed. Debtor cites to a provision in the Internal Revenue Code  which provides in relevant part:

> (a)  Length of period.— Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun —
>
> (1) within 10 years after the assessment of the tax ...

*26 U.S.C § 6502(a)(1).*  The Debtor notes that  IRS Claim 11–1 shows assessment dates as follows for each of the tax years at issue:

- Tax Year 2004        December 5, 2005
- Tax Year 2005        January 8, 2007
- Tax Year 2006        April 7, 2008
- Tax Year 2007        November 17, 2008
- Tax Year 2008        August 31, 2009

These are the original dates on which assessments were made for each of the tax years, and the Debtor points out, correctly, that each of those assessment dates is more than 10 years prior to the bankruptcy filing date of November 21, 2019.  Debtor  argues that means the claims for those tax

9

years are stale and should be disallowed pursuant to *11 U.S.C. §502(b)(1)*, which provides that a

claim should be disallowed if it is unenforceable against the debtor under "applicable law." The IRS

counters, again correctly, that it has since filed an amended proof of claim, designated as Claim

11–2, in which assessment dates as follows are shown for the tax years in question:

- Tax Year 2004      July 22, 2013
- Tax Year 2005      July 22, 2013
- Tax Year 2006      June 28, 2013
- Tax Year 2007      June 28, 2013
- Tax Year 2008      August 31, 2009

These assessment dates as shown in Claim 11-2 are the dates of "supplemental" assessments that

were made by the IRS following the Debtor's submission of amended tax returns for each of the

years. The IRS argues that its claims are timely because it has been less than 10 years since the

dates for the 2004 through 2007 supplemental assessments, and because the Debtor voluntarily

agreed to an extension regarding the 2008 tax year.

This state of affairs raises as an initial question whether the IRS was free to file the

amended proof of claim 11–2? A related question is whether a validly filed amended proof of claim

has the same evidentiary effect as an initial proof of claim. The Debtor has not expressly objected

to the filing of the amended proof of claim by the IRS. Rather, the Court is raising these questions

*sua sponte* as a means of determining whether the amended proof of claim should be recognized,

and if so what effect it should be given.

The first point to note is that the amended proof of claim was not filed until

September 14, 2020. It was thus filed <u>after</u> the claims bar date of May 19, 2020, though before plan

confirmation, which occurred on January 22, 2021. *See* main case Doc. No. 311. The post-bar date

nature of the amended proof of claim thus means that the IRS did not have an absolute right to file

it. The law in this regard was aptly summarized as follows:

> The decision to allow amendments to a proof of claim is within the
> discretion of the Bankruptcy Court .... An amendment to claim filed
> post bar date must be scrutinized to assure that it is not an attempt to
> file a new claim .... The Court of Appeals for the Third Circuit has
> determined that amendments to proofs of claim should be allowed
> when "the purpose is to cure defects in a claim as originally filed, to
> describe a claim with greater particularity, or to plead new theories
> of recovery on facts set forth in the original claim."

*In re Exide Techs*., 601 B.R. 271, 291 (Bankr. D. Del. 2019), *aff'd,* 613 B.R. 79 (D. Del. 2020)

(citations and footnotes omitted). The Court finds that under this standard the amended proof of

claim filed by the IRS in this case was permissible. The amended proof of claim did not change the

total amount of the claim as set forth in the original proof of claim, nor did it change the tax years

at issue. It merely cured defects which the IRS apprehended to be in the original proof of claim,

those being the dates of the relevant assessments and the secured/unsecured characterization of

certain of the tax years. The Debtor could not have been unfairly prejudiced by the amended proof

of claim, particularly since no plan had yet been confirmed. As a result the amended proof of claim

would have been permitted by the Court even if the Debtor had objected to it, and it relates back to

the filing date of the original proof of claim, which was itself timely filed prior to the bar date. *See*

*In re Washington*, 420 B.R. 643, 646 (Bankr. W.D. Pa. 2009)

Turning next to the question of the evidentiary effect of the amended proof of claim,

the Court first notes the general rule that a proof of claim that  conforms with filing requirements,

including required supporting information, constitutes prima facie evidence of the validity and amount of the claim. *See 11 U.S.C. §502(a)*, *Fed.R.Bankr.P. 3001(f)*. A permissibly filed and conforming amended proof of claim carries the same prima facie evidence of validity as does an original proof of claim. *See, e.g.*, *In re Rozinski*, 487 B.R. 549, 555 (Bankr. D. Colo. 2013), *In re Bates*, 81 B.R. 63, 63–64 (Bankr. D. Or. 1987).

The Court therefore finds Claim 11–2 to be presumptively valid, including the assessment dates for the various tax years as set forth therein. A party that objects to a proof of claim "bears the burden of producing sufficient evidence to overcome the presumed validity of the filed claim." *In re Shubh Hotels Pittsburgh, LLC*, 476 B.R. 181, 185 (Bankr. W.D. Pa. 2012). As one court explained regarding an objection to an IRS tax claim:

> An objecting party may meet this burden by producing specific and detailed allegations that place the claim into dispute, by presenting legal arguments based on the contents of the claim and its supporting documents .... If the objecting party comes forth with such evidence rebutting the claim, then the claimant must produce additional evidence to prove the validity of the claim by a preponderance of the evidence .... *see also 26 U.S.C. 7491(c)* ("Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.").

*In re Canada*, 574 B.R. 620, 627 (N.D. Tex. 2017) (citations omitted).

The Debtor here does not attempt to meet his burden by challenging the factual assertion that supplemental assessments actually occurred on the dates as indicated in the amended proof of claim, or by questioning the amount of the claims. Rather, Debtor makes a legal argument

to the effect that there is but one 10-year period available under *26 U.S.C. §6502(a)(1)* and that it

commences running when the original assessment is made.  While conceding that supplemental

assessments are permitted, Debtor asserts that a supplemental assessment does not result in the start

of a new 10-year period for collecting the tax.

The Debtor raises two main points in support of this argument, neither of which the

Court finds persuasive.  The first point is based on public policy.  Debtor suggests that  a

supplemental assessment can be made at any time by the IRS, and argues that if the ten-year period

of collectability begins anew whenever a supplemental assessment is made, then the 10-year

limitation period  becomes "virtually meaningless" because the IRS can restart the clock anytime

it wants. This argument is based on a false premise.

The IRS is not free to make a supplemental assessment any time it wishes to do so.

*26 U.S.C. §6204(a)* provides the general rule that the IRS may "at any time within the period

prescribed for assessment, make a supplemental assessment *whenever it is ascertained that any*

*assessment is imperfect or incomplete in any material respect*" (emphasis added). Thus, the IRS

must have some basis for believing  that an existing assessment is imperfect or incomplete in some

material way before it can make a supplemental assessment.  *See e.g.*, *Johnson v. U.S*, 123 F.3d 700,

704 (2d Cir. 1997):

> [W]e believe that Congress intended to allow the IRS to correct
> errors in assessments by making a curative assessment pursuant to
> §6204 whenever it becomes aware of a colorable challenge to the
> validity of the underlying assessment.

The Court finds that in the circumstances of this case, wherein the Debtor filed tentative carryback

claims and amended tax returns a number of years after the original turns were filed, the IRS had

a reasonable basis for believing the original tax assessments for the years in question were imperfect or incomplete in a material respect and therefore needed to be supplemented and therefore rejects Debtor's argument to the contrary.

By taking the above approach, the Court here does not rule out the possibility that in another case under a different set of facts there might be a good public policy argument as to why the issuance of a supplemental assessment by the IRS should not be found to trigger a new 10-year period of collectability. If, for example, the evidence showed that the IRS made a supplemental assessment solely in an effort to forestall the imminent expiration of its time to collect a tax, with no indication of anything of significance being wrong in the original assessment, the Court might be more favorably disposed to such argument. But the present case is nothing like that. There is no question that the IRS had a justified reason for making supplemental assessments in this case after the Debtor filed the tentative carryback claims resulting in large refunds, which subsequently-filed amended tax returns did not support. The need for supplemental assessments in these circumstance was thus apparent and caused solely by the actions of Debtor. The IRS simply reacted in a proper manner to the Debtor's actions, and there is absolutely no evidence to indicate that the IRS engaged in any sort of gamesmanship or scheme to circumvent the collection period limit.

The second point raised by the Debtor to support his argument is based on language found in the regulations that implement *26 U.S.C. §6204*. Specifically, Debtor points to the following regulation:

> If any assessment is incomplete or incorrect in any material respect, the district director or the director of the regional service center, subject to the restrictions with respect to the assessment of

14

> deficiencies in income, estate, gift, chapter 41, 42, 43, and 44 taxes, *and subject to the applicable period of limitation*, may make a supplemental assessment for the purpose of correcting or completing the original assessment.

*26 C.F.R. § 301.6204-1* (emphasis added).  Focusing on the highlighted phrase in this regulation, the Debtor argues that it means that making a supplemental assessment does not "alter the duration of the window for collection."  Debtor's *Post-Trial Brief*, July 2, 2021, at 5-6, Doc. No. 83.

The Debtor has not cited any authority which construes this regulation to mean what the Debtor contends it does, and the Court does not find Debtor's interpretation to be a reasonable one.  There are actually two limitation periods involved here: the limitation period for the IRS to file an assessment, which is generally within three years after the return is filed, *see 26 U.S.C. §6501(a)*, and the limitation period for the IRS to collect a tax after an assessment has been made, *i.e*., the 10-year period under *26 U.S.C. §6502(a)(1)* as previously discussed.  Since the regulation cited by the Debtor deals only with the making of an assessment, rather than the collection of a tax, it is far more likely that the "applicable period of limitation" to which the regulation refers is the limitation period for making assessments.  *See Allan v. United States*, 386 F. Supp. 499, 504 (N.D. Tex. 1975) (noting that *26 U.S.C. §6204* permits the IRS to make a supplemental assessment at any time within the period prescribed for assessment if it is determined that the original assessment is deficient in any material respect, and that "the parallel regulation, §301.6204-1, says essentially the same thing.")  Under this view the highlighted language in the regulation is merely saying that, for example, a supplemental assessment based on an amended tax return would generally have to be made within

15

3 years after that amended return was filed.[6]

The IRS contends that all of the supplemental assessments on which its claim is based for tax years 2004 through 2008 were made less than 10 years ago, and that collection as to those taxes is therefore within the limitation of *Section 6502(a)(1)*.  This position is correct if the limitation period runs from the date of the supplemental assessments rather than from the date of the original assessments.  The only case the Court was able to find in which this specific question was previously raised and answered is *United States v. Turk*, 290 F. Supp. 588 (N.D. Ohio 1968).  In that case the IRS made an assessment against the taxpayer on June 17, 1957, and then upon subsequently determining that the penalty component of that assessment was in error it abated the original assessment and made a supplemental assessment on August 21, 1959.  When the IRS filed an action seeking to collect the tax, the taxpayer argued that the action was barred because it had not been brought within the six-year period then allowed under *Section 6502*.[7]  The court rejected that argument, stating:

---

[6]

      The Court notes that the Debtor has not contended that the supplemental assessments made in this case were untimely or otherwise improper.  Furthermore, the IRS has pointed to uncontested statutory authority as to the timeliness and appropriateness of each of the supplemental assessments.  For tax years 2004 through 2007 the supplemental assessments were timely and authorized pursuant to *26 U.S.C. §6501(k)* (dealing with assessments following tentative carryback adjustments) and for tax year 2008 the supplemental assessment was done pursuant to *26 U.S.C. §6501(c)(4)* (dealing with extensions of time for the IRS to assess where the taxpayer has consented in writing to such extension.)  The Court therefore finds that all of the supplemental assessments were timely and appropriate.

[7]

      The collection period in *Section 6502* was extended from 6 years to 10 years as part of Section 11317 of the Omnibus Budget Reconciliation Act of 1990, PL 101–508.

The instant action was filed within 6 years after the August 21, 1959 assessment but more than 6 years after the June 17, 1957 assessment. Defendant Turk urges that the June 17, 1957 date rather than the August 21, 1959 date governs in determining whether the instant action is barred under 26 U.S.C.A. 6502.

It would appear that there are no reported decisions which consider the specific question here raised. However, this court is of the view that Section 6502 clearly contemplates that the timeliness of an action for collection is to be determined on the basis of the specific assessment which is the subject matter of the action. Here, the specific assessment involved is that dated August 21, 1959. Since that assessment is a valid assessment made within the three year period provided by section 6501, and, further, since this action for collection was brought within 6 years thereafter, the court finds that the action is not barred under section 6502.

*Turk* 290 F. Supp. at 589–90 (footnote omitted). This Court agrees with that conclusion and finds

that the Debtor has failed to meet his burden to overcome the presumed validity of the IRS proof of

claim and demonstrate that the tax claims related to the 2004 through 2008 tax years are time barred.

### (B) Dischargeability of the Tax Debt (Count III)

In Count III the Debtor seeks a ruling that his tax obligation to the IRS is not

excepted from discharge in this bankruptcy pursuant to *11 U.S.C. §523(a)(1)*. As relevant here, that

provision excepts from discharge federal income tax debt "with respect to which the debtor made

a fraudulent return or willfully attempted in any manner to evade or defeat such tax." It can thus be

seen that *Section 523(a)(1)(C)* contains two distinct grounds pursuant to which a debtor's tax

obligation may be found to be excepted from discharge: filing a fraudulent return or willfully

attempting to evade or defeat the tax.

17

It is not entirely clear if the IRS is relying at all on the fraudulent return prong of *Section 523(a)(1)(C)*. On the one hand, at the time of trial the Court understood the IRS's position to be that "[t]his is not a fraudulent return case, this is a willful evasion scenario." *See*, *Trial Tr.* at 12:12–13 (opening statement of the IRS attorney). However, in post-trial filings the IRS seems to argue that the Debtor knew he was not entitled to refunds for the 2004 through 2008 taxes at the time he, acting through Price, filed the amended tax returns, which sounds suspiciously like a fraudulent return claim. *See Defendant's Post-trial Brief*, April 13, 2021, at 11–12, Doc. No. 37. The IRS thus appears to be taking inconsistent positions, but ignoring that and in any event, the record does not establish a fraudulent return scenario.

The IRS points to two items in the evidentiary record to support its apparent belated fraudulent return argument. The first is, Stipulated Fact No. 7, which provides:

> 7. As early as 2012, Debtor was aware that the IRS claimed that he owed outstanding taxes to the IRS, and that there was an IRS problem that he needed to address.

*See Consolidated Pretrial Statement*, April 13, 2021, Doc. No. 37. The second is the following testimony from the Debtor at trial:

> A.    [W]hat I understand is this, is that back in those days I got those refunds, and I probably didn't deserve to have those refunds, but Mr. Price was trying to do me a solid.

*Trial Tr.* at 49:23–25. While Stipulated Fact No. 7 is sufficient to show that Debtor knew by 2012 that the IRS claimed he owed taxes, neither it nor the cited trial testimony establish that he knew he was not entitled to the refunds when the amended returns were filed. Rather, the Stipulated Fact

18

and the cited testimony are consistent with a conclusion that the Debtor came to realize only sometime after the amended returns were filed that he should not have received the refunds, and that is how the Court interprets them, thus rejecting any claim of nondichargeability under *Section 523(a)(1)(C)* based on the filing of fraudulent returns.

That leaves willful evasion as a potential basis for a finding of nondischargeability and the Court must therefore determine whether the acts or omissions of Debtor vis-a-vis his tax obligation fall within that prong of the *Section 523(a)(1)* exception to discharge. The key case in this Circuit on that issue is *In re Fegeley*, 118 F.3d 979 (3d Cir. 1997). The *Fegeley* court began by noting that the exception must be strictly construed in favor of the debtor, and that the burden of proving that a debtor's tax liability is not dischargeable under the exception is on the government. 118 F.3d at 983. It then found that "[t]he plain language of the second part of §523(a)(1)(C) comprises both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully')." *Id.* (quoting *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996)).

With respect to the conduct component, the *Fegeley* court pointed out that Congress did not define or limit the methods by which a willful attempt to evade or defeat a tax might be accomplished, and also used the phrase "in any manner" in the statute. Despite this expansive basis for the exception, a debtor's mere failure to pay taxes standing alone does not fall within the scope of the exception, although it is relevant evidence that should be considered as part of the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes. *Id.* at

984. This would especially apply when the debtor failed to pay taxes while having the resources to

do so. Additionally, affirmative conduct by a debtor is not required since the exception encompasses

culpable acts of omission as well. *Id.* As to the mental component of willfulness under *Section*

*523(a)(1)(C)*, the *Fegeley* court rejected the argument that some fraud by the debtor must be shown,

instead holding that the standard of "civil willfulness" applies. *Id.* This means that the IRS need

only show that the debtor's attempts to avoid tax liability were "voluntary, conscious, and

intentional." *Id.*

Under the willful evasion prong of *Section 523(a)(1)(C)*, the IRS points to extensive

international leisure travel that the Debtor did during the period from 2014 through 2019, as well

as some expensive purchases he made while on those trips — all at a time when he knew he owed

taxes and was not making any payments on his liability. *See Defendant's Post-Trial Brief* at 12.

As far as the travel itself, the Court gives that little weight.

The Debtor testified that most of the travel expense was paid for by his wife, and the

IRS presented no evidence to rebut that contention. The purchases made during the trips are more

problematic for Debtor. They consisted of a $3,500 ring, a Turkish rug for between $13,000 and

$15,000, and another ring (a wedding ring for his wife) for $18,000. Although the total amount of

these expenditures over a 5-year period is not huge, it is by no means *de minimis* either, and the

purchased items were clearly luxury items rather than necessities, notwithstanding Debtor's opinion

to the contrary.[8]  Also troubling is that the Debtor failed to report the purchase of the $18,000 ring

in response to the pretrial discovery request by the IRS — such information only coming out at trial.

*See Trial Tr.* at 80:05–19.

Another area cited by the IRS in support of its willful evasion argument is with

respect to the real properties owned by the Debtor.   The IRS first argues that some of these

properties earned income during the period of 2014 through 2019, but the Debtor did not use any

of the revenue to pay toward his tax debt.   There is, however,  no evidence of record to show how

much income the Debtor earned from these properties during the period in question, and in fact there

is nothing in the record to show that the Debtor earned any income from them.   The IRS also argues

that the Debtor's retention of  some of the properties under the confirmed plan, rather than selling

them to pay toward the IRS debt, is a willful evasion of tax.   The IRS could have filed an objection

to the Debtor's plan but it did not do so.   This argument amounts to a collateral attack on the plan

and will not be allowed.   The final point raised by the IRS to support its position as to willful

evasion is in the Court's view by far the most significant.

---

[8]

In explaining his purchase of the wedding ring, the Debtor testified:

> A.  Well, I got married to my wife, so I got a wedding ring, and that's
> freaking necessary. So it doesn't (indiscern.) there. And so yeah, it
> was expensive. It was about 18 grand,  I believe. I bought it.  I'm not
> apologizing for it.  It was freaking necessary.

*Trial Tr.* at 62:17–21.  Perhaps a moderately-priced wedding ring could be considered a necessary,
but in the Court's view an $18,000 wedding ring purchased at a time when the purchaser was deeply
in debt to the IRS was clearly a luxury.

In 2017 or 2018 the Debtor settled a litigation claim against his former business partners for approximately $800,000.  After attorney fees were deducted from the settlement the Debtor received approximately $600,000.  Even though he had known for a number of years by then that he owed a substantial tax obligation to the IRS, the Debtor did not use any of the settlement proceeds to pay toward the tax debt, or even set any of it aside for a later payment.  Instead, the Debtor used the proceeds to purchase the residence where he currently resides.[9]  Debtor stated that he needed a new place to live at that time because the house in which he had been residing previously had been flooded as the result of a hurricane in 2016 and had effectively been condemned by local authorities.  *See Trial Tr.* at 58:02– 59:07.

Accepting the Debtor's testimony as true, the Court nevertheless finds this incident to be strongly suggestive of an effort by the Debtor to willfully evade his tax obligation.  The Debtor did not explain why he would have had to buy a new house on a cash basis, rather than simply make a downpayment and finance the balance with a home mortgage, which would have left much of the settlement freed up and available to apply toward the tax liability.  It is also significant to note that the evidence of record does not establish how much the Debtor paid for his current residence.  The petition filed by the Debtor in this 2019 case shows a value of $344,976 for the residence, so presumably the purchase price the year previously in 2018 would have been somewhere near that amount.  That leaves approximately $250,000 of the settlement proceeds unaccounted for.  What did

---

[9]

Also of concern to the Court and further undermining Debtor's credibility as to motive in purchasing his residence with settlement funds rather than significantly reducing his tax debt is that the Debtor did not purchase the residence in his own name, but instead provided the funds to an LLC controlled by him which then made the purchase.  At the final argument Debtor's attorney attempted to justify that transaction by stating it was structured in that manner in order to protect the Debtor from malpractice liability.

the Debtor do with it?  The record does not disclose, although clearly it was not used in any way to address the tax liability.

The Court finds that the IRS made a prima facie showing that the Debtor willfully attempted to evade or defeat his tax liability.  The Debtor's conduct in making approximately $35,000 in unnecessary, luxury purchases while owing tax liability, and more especially his diversion of the $600,000 settlement proceeds for use to buy a new house, and perhaps other undisclosed purposes,  without using or setting aside any of those proceeds as a fund devoted to address his tax liability, are sufficient to meet the conduct component of *Section 523(a)(1). See e.g.*, *In re Weiss*, 237 B.R. 600, 606 (Bankr. E.D. Pa. 1999), *aff'd in part, rev'd in part sub nom. United States v. Weiss*, 2000 WL 1708802 (E.D. Pa. Nov. 15, 2000), *aff'd sub nom. In re Weiss*, 276 F.3d 582 (3d Cir. 2001), *opinion amended and superseded*, 32 F. App'x 32 (3d Cir. 2002) ("Even after learning of his large tax debt, the Defendant failed to make any payments in an effort to cure his arrears with the IRS ... it can clearly be said that "[t]his is a case where the debtor ... in lieu of payments on taxes, purchased a valuable home and numerous luxury items."); *In re Lacheen*, 365 B.R. 475, 486 (Bankr. E.D. Pa. 2007) ("A further indicia of an intent to evade payment of taxes is drawn from evidence that the taxpayer had the financial resources to pay but simply did not ....  Even where the returns are filed, the failure to pay the IRS because available income has been directed to other, often non-essential purchases is sufficient to preclude a discharge under §523(a)(1)(C)."); *In re Rossman*, 487 B.R. 18, 39 (Bankr. D. Mass. 2012) ("[T]he inescapable conclusion is that Rossman had disposable income from which he could have made some payments to the IRS and the failure to use at least some of that income to satisfy the increase in tax owed ... evidences an evasion of tax liability".).

The Debtor also acted with the requisite mental state.  The Debtor is a highly-educated and sophisticated individual, with 3 different graduate degrees, including an MBA.   He acknowledges being aware as early as 2012 that the IRS claimed he owed outstanding taxes and that there was a problem he needed to address.   Debtor made his luxury purchases and use of the settlement funds to buy a house after 2012 with the full knowledge that he then had a large tax liability.   His actions were voluntary, conscious, and intentional.   Thus, both of the *Fegeley* components have been proven by the IRS by a preponderance of the evidence.

Once the IRS makes out a prima facie case for nondischargeability, as it has done here,  the burden of going forward with credible evidence to satisfactorily explain his conduct shifts to the Debtor, although the ultimate burden of persuasion remains with the IRS.  *See, e.g.*, *Matter of Brooks*, 58 B.R. 462, 464 (Bankr. W.D. Pa. 1986); *In re Buzzelli*, 246 B.R. 75, 116 (Bankr. W.D. Pa. 2000); *In re De Caris*, 585 B.R. 787, 791 (Bankr. D.S.C. 2018).  Here, the Debtor counters by arguing that he "continuously engaged in good faith efforts to resolve the IRS claim." *Plaintiff's Post-Trial Brief* at 8.  This is apparently a reference to the undisputed fact that the Debtor submitted three "offers-in-compromise" to the IRS, all of which were rejected. The Debtor is apparently of the view  that the mere submission of these offers-in-compromise establishes that he was acting in good faith and not with an intent to evade taxes.  This is the same position advanced by the debtor in *In re Klayman*, 333 B.R. 695 (Bankr. E.D. Pa. 2005), who argued that he lacked an intent to evade taxes because he had made four offers-in-compromise to the IRS during the period from 1991 through 1998.  The *Klayman* court rejected that proposal, stating that "[w]hat matters ... is the probative value of such offers. This entails an analysis of the timing and circumstances under which they were made." *Id*. at 704.  Other courts have noted that the offer-in-compromise process can

24

actually be used by a taxpayer as a means of delaying collection efforts by the IRS. *See, e.g., In re Colish*, 289 B.R. 523 (Bankr. E.D. N.Y. 2002) (finding that an attorney familiar with the offer-in-compromise process was attempting to delay the collection of his taxes by filing "serial" offers that were "clearly too low in relation to the tax obligations owed"); *In re Feshbach*, 974 F.3d 1320 (11th Cir. 2020) (finding that taxpayers used the offer-in-compromise process to delay collection; taxpayer/husband was sophisticated and understood that a pending offer would halt IRS collection efforts).

Thus, without some evidence as to the nature and circumstances of the offers-in-compromise made by the Debtor, not just the bare fact of their existence, the Court cannot find that they support a finding of good faith by the Debtor. The Court has been provided with no details whatsoever concerning the offers-in-compromise made by the Debtor, and thus it has no basis for making the necessary analysis as to the timing and circumstances of them.

The Court thus finds that the IRS has proven by a preponderance of the evidence that the Debtor's tax obligation is nondischargeable under *Section 523(a)(1)(C)*, and the Debtor has failed to come forward with any credible evidence that might satisfactorily explain why his conduct should not be viewed as a willful effort to evade or defeat his tax liability. The Debtor's tax debt to the IRS is therefore found to be nondischargeable in this bankruptcy.[10]

---

[10]

Neither side has raised the issue of whether under *Section 523(a)(1)* the entire tax debt is nondischargeable, or whether the nondischargeability only extends to a level corresponding with the Debtor's willfully evasive conduct. That level in this case would be approximately $635,000 based on the $600,000 net settlement that was used to purchase a house and possibly for other things as well, and the roughly $35,000 in luxury purchases. Since the total IRS claim is approximately $945,000, such an approach would result in a finding that the IRS debt was at least partially dischargeable. The Court's own research leads it to a tentative conclusion that a partial discharge

### (C)   *Avoidance of IRS Liens*

The last topic to be considered is the Debtor's attempt to avoid IRS tax liens on

certain parcels of real property pursuant to *11 U.S.C. §§506(d)* and *1123(b)(5)*, as set forth in Counts

VI through VIII, X and XI of the Amended Complaint.[11]  In these counts, the Debtor seeks to have

the IRS tax liens as to the subject properties either stripped off completely because the Debtor has

no equity in them due to the existence of other liens with a higher priority than the IRS lien, or

stripped down to the amount of his equity as to those properties after considering other higher

priority liens.  The IRS, while not contesting the valuations of the properties or the resulting Debtor

equity as was presented by the Debtor at trial, argues for a number of legal reasons that the requested

relief may not be granted.

To begin with, the unrebutted appraisal evidence that was presented by Debtor at

trial, which the Court found to be credible, and the proofs of claim filed in the case,[12] establish the

---

is not possible under *Section 523(a)(1)*, and that once a willful attempt at evasion is shown the entire tax debt becomes nondischargeable.  *See* the discussion in *Feshbach v. Department of Treasury, Internal Revenue Service*, 594 B.R. 495, 501–502 (M.D. Fla. 2018), *aff'd sub nom. In re Feshbach*, 974 F.3d 1320 (11th Cir. 2020). For that reason, and because no one has raised the issue of a potential partial discharge,  the Court will find the entire tax debt nondischargeable at this time, although if either side wishes to raise the issue in a timely-filed motion for reconsideration the Court will revisit the issue.

[11]
    As was noted above, Counts V and IX are now moot because the properties involved in them were sold during the bankruptcy pursuant to *11 U.S.C. §363*, without any objection by the IRS, and Count IV is moot or abandoned by the Debtor who pursuant to a settlement has conceded to having no ownership interest in that property.

[12]
    The Debtor has asked that the Court take judicial notice of the proofs of claim filed by the other lienholders on the subject properties.  It would have been preferable for the Debtor to have provided evidence at trial as to the amounts of the other liens on the subject properties.  However, the relevant proofs of claim do appear to meet the formal filing requirements of *Fed.R.Bankr.P.*

following values of the properties and available equity in each for purposes of *Sections 506* and

*1123(b)(5)*:

| Count | Property | Value | Higher priority liens | Debtor equity (before considering IRS lien) |
|---|---|---|---|---|
| VI | 155 Chesterfield, Pittsburgh, PA | $160,000 | $164,813.29* | 0 |
| VII | 237 Chesterfield, Pittsburgh, PA | $145,000 | $113,609.89* | $31,390.11 |
| VIII | 145 Chesterfield, Pittsburgh, PA | $160,000 | $ 92,720.60 | $67,279.40 |
| X | 1132 SE Kings Bay Dr., Crystal River, FL | $525,000 | $544,722.02 | 0 |
| XI | 731 Rosedale, Annapolis, MD | $375,000 | $390,203.90 | 0 |
| | * The totals for these "higher priority liens" include the same $92,720.60 cross collateralized lien of Nextier Bank subject only to but a single satisfaction. | | | |

As explained in the "Note" to the foregoing chart, the above is somewhat misleading, however,

because Nextier Bank has a lien of $92,720.60 which  is attached to all 3 of the "Chesterfield"

properties.  If these 3 properties are viewed collectively as a group, it would show an aggregate

value of $465,000, with higher priority liens of $185,702.58, and a resulting Debtor equity of

$279,297.42.  The Court will address this issue, *infra.*

---

*3001*, are thus entitled to the prima facie validity provided of *Fed.R.Bankr.P. 3001(f)*, and are a proper subject for judicial notice pursuant to *F.R.E. 201.  See, e.g., In re Mahmud*, 2008 WL 8099115 *6–9 (Bankr. E.D. Pa. December 4, 2008).  The Court thus can and does  take judicial notice of these proofs of claim.  The Court further notes that the IRS itself apparently admits to the accuracy of at least some of these proofs of claim in that its proposed findings of fact incorporate lien amounts based on them.  *See* Doc. No. 80, ¶57.

The starting point for a resolution of the IRS lien dispute is the opinion in *I.R.S. Dept. of Treasury of U.S. v. Johnson*, 415 B.R. 159 (W.D. Pa. 2009),  which is binding on this Court.  In that case the Chapter 11 debtor was permitted to strip off an IRS tax lien on his real property when he showed that he had no equity in the property because higher priority liens (a mortgage and a local real estate tax lien) collectively exceeded the value of the property.  In so holding, the *Johnson* court stated:

> Section 1123(b)(5) permits a debtor to "modify the rights of holders of secured claims" in conjunction with a Chapter 11 plan of reorganization. 11 U.S.C. § 1123(b)(5). Therefore, to strip a lien in a Chapter 11 proceeding, a court must bifurcate the lien into secured and unsecured claims under § 506(a) and then, if a debtor's plan of reorganization meets the requirements of § 1123(a), a secured claim may be modified pursuant to § 1123(b)(5).

415 B.R. at 169.

Thus, under *Johnson* it is clearly possible for a Chapter 11 debtor to strip the unsecured portion of an IRS lien via a confirmed plan of reorganization.  It would also appear at first blush that  the Debtor here has satisfied the requirements to do so.  First, as set forth in the chart appearing directly above, the Debtor has sufficiently proven facts to establish the basis for a bifurcation of the IRS lien into secured and unsecured claims with respect to the properties in Counts VI through VII, X, and XI pursuant to *11 U.S.C.. §506(a)*.[13]  Second, the Debtor's Plan  was

---

[13] The Court notes that the Amended Complaint incorrectly refers to *11 U.S.C. §506(d),* rather than *(a),* as the relevant subsection of *Section 506* to be applied in the lien stripping process. *See* Amended Complaint at ¶¶49, 54, 58, 66, 70.  The Court disregards that error pursuant to *Fed.R.Bankr.P. 7015*, incorporating *Fed.R.Civ.P. 15(b)(2)* (when an issue not raised in the pleadings is tried by parties' consent it must be treated in all respects as if raised in the pleadings).

confirmed by the Court on January 22, 2021, the Court finding in such Order that the requirements

for confirmation under *11 U.S.C. §1129* were satisfied. *See* Doc. No. 311.[14]

       Since among the requirements for plan approval under *Section 1129* is that "[t]he plan

complies with the applicable provisions of this title," *11 U.S.C. §1129(a)(1)*, the confirmation order

thus implicitly found that Debtor's Plan passed muster under *11 U.S.C. §1123(a).*  The confirmation

order is final and has a binding res judicata effect on all parties. *See e.g., In re Samson Resources

Corp.*, 590 B.R. 643, 649 (Bankr. D. Del. 2018) (citing cases).  *See also United Student Aid Funds,

Inc. v. Espinosa*, 559 U.S. 260 (2010) wherein the Court held that a bankruptcy court order

confirming a plan providing for a discharge of student loan debt is a final judgment that is

enforceable against its non-objecting student loan creditor even though the plan as confirmed was

"erroneous" in the sense that it included relief that the Bankruptcy Code did not allow absent a

finding of "undue hardship," which had not been made.  The *Espinosa* court found that the affected

creditor had been given proper notice of the proposed plan, so its due process rights had not been

violated.  The only remaining question is therefore whether the Plan was sufficient to invoke  lien

modification of the IRS lien as authorized by *11 U.S.C. §1123(b)(5).*

---

[14]

      The IRS never filed an objection to the Plan prior to confirmation.  Because confirmation
was done on a "cramdown" basis, the effective date of the confirmation was delayed until February
8, 2021 to allow interested parties one more chance to object and thereby trigger a hearing on
confirmation.  The IRS was served with the confirmation order on January 22, 2021.  *See* Doc. No.
312.  The IRS did not file an objection, nor did any other interested party, and the confirmation
therefore became effective on February 8, 2021.

As recounted previously, the Plan does include provisions indicating that the Debtor was seeking to modify the IRS lien.  Section 1.26 of the Plan defines the term "IRS Adversary Case" as referring to the within adversary case.  Section 4.6 then states as follows:

> 4.6. **Treatment of Claims in Class 6: Secured Tax Claims**. Unless the Debtor and the Holder of an Allowed Claim in Class 6 agree to less favorable treatment, the Holder of each such Allowed Claim shall receive equal monthly installment payments in the amount necessary to pay the full amount of such Allowed Claim, with interest accruing at the rate of 3% per annum as of the Confirmation Date, pursuant to section 511(b) of the Bankruptcy Code. The first of the monthly installment payments described in this section shall be paid on the first day of the month immediately following the Effective Date and successively thereafter for each of the next 59 months.
>
> The Debtor has filed the IRS Adversary Case, seeking a determination of the secured status and dischargeability of the IRS Claim. However, until the IRS Adversary Case is adjudicated, the Debtor will make payments pursuant to this section as though the IRS Claim will remain unchanged through the IRS Adversary Case. Provided, however, in the first full month after the IRS Adversary Case is adjudicated, that the Debtor will recompute such payments to confirm with the outcome of the IRS Adversary Case, with any payments that the Debtor made to the Holder of an Allowed Claim in Class 6 under this Plan prior to such adjudication to be credited against the adjusted amount of such claim.

Doc. No. 265, §4.26.  It is difficult to see how much more clear the Plan could have been in putting the IRS on notice as to the Debtor's intent to modify the IRS tax lien.  It should further be recalled that this adversary proceeding was filed on August 31, 2020, *i.e.*, months before the Plan was filed and confirmed.  The IRS thus knew exactly what relief the Debtor was seeking by way of this adversary when the Plan was under consideration.  Furthermore, the Disclosure Statement that accompanied the Plan also reinforced the Debtor's intention.  *See* Disclosure Statement at p. 2 ("... the Debtor will seek a determination that no portion of the secured claim of the Internal Revenue

Service should be accorded priority or secured status, and all of it should be subject to discharge"),
and p.7 (stating that the IRS secured tax claim of $518,691.13 will be paid in equal monthly
installments with statutory interest "pending determinations of (I) secured status; and, (ii)
dischargeability. Payments will be adjusted in accordance with those determinations"). *See* Doc.
No. 266. The Court thus tentatively finds that the requirements for lien modification pursuant to *11
U.S.C. §1123(b)(5)*, as set forth in *Johnson,* have been met here. The IRS raises several points in
opposition to any modification of its lien which the Court now turns to consider.

First, the IRS argues that its lien is single, or unitary, in nature, and that it cannot be
bifurcated or stripped as long as there is equity in any of the property — real or personal — to
which the lien has attached. *See generally IRS Post-Trial Brief* at 14–15, Doc. No. 81. The only
authorities in support of such position cited by the IRS are *In re Williams,* 488 B.R. 492 (Bank. M.D.
Ga. 2013) and *In re Hoekstra*, 255 B.R. 285 (E.D. Va. 2000). However, the IRS also relied on
*Hoekstra* in the *Johnson* case, and the court there rejected the IRS argument, finding that *Hoekstra*
was "distinguishable" as that case involved a Chapter 7 liquidation. 415 B.R. at 170 ("In this case,
Johnson's confirmed Amended Plan of Reorganization obviates the concerns articulated by the
Supreme Court in *Dewsnup* [*v. Timm*, 502 U.S. 410 (1982)] and the district court in *Hoekstra*.").
*Williams* had not yet been decided when the *Johnson* opinion was issued, but since it too was a
Chapter 7 case the Court concludes it too should be rejected as persuasive authority against
modifying an IRS tax lien under Chapter 11.

The Court is therefore left with *Johnson*, which clearly authorizes the strip-off or
strip-down of an IRS tax lien or to particular pieces of property, notwithstanding the contention by

the IRS that the nature of its lien does not allow for such treatment.  *See also e.g.*, *In Re Walker*, 218

WL 3752995*4 (Bankr. S.D.N.Y. August 6, 2018) ("while 26 U.S.C. §6321 confers upon the IRS

a single lien on all of a debtor's real and personal property for nonpayment of taxes, the IRS is not

afforded any added protection or special status that guards against modification of a creditor's lien

rights through a chapter 13 plan.").

Next, the IRS argues that modifying its lien by stripping it from certain properties

should not be permitted because the IRS's  secured claim can only be altered through a Chapter 11

plan, and the Debtor's confirmed Plan "provides for payment in full of the IRS' secured claim." *IRS

Post-Trial Brief* at 14.  That argument is based on a false premise. As appears in the quotation of

Section 4.26 of the Plan set forth above, the Plan only provides for payment in full of the IRS

secured claim until such time as a decision is rendered in this adversary proceeding, whereupon "the

Debtor will recompute such payments to confirm with the outcome" of this case. If the IRS had a

problem with that provision of the Plan it should have raised an objection to the Plan.  It did not do

so.

The IRS also complains that the Debtor has not sought to modify the Plan regarding

the IRS lien, and asserts that unless and until he does so the confirmed Plan controls and Counts VI

through VII, X, and XI must be dismissed.  However, assuming without deciding that a modification

of the Plan would be necessary to implement the outcome of this adversary proceeding, that outcome

is only being announced now so it is obvious that a plan modification as to this matter could not

previously been pursued.  Whether or not a modification of the Plan will be required is not before

the Court at this time, though clearly there is statutory authority for such a modification if necessary.

32

*See, e.g., 11 U.S.C.. §1127(e)*;  *In re Deel*, 213 B.R. 112 (W.D. Va. 1997) (confirming a Chapter 13 plan  while there was a pending adversary proceeding involving the status of an IRS claim; court noting that plan could always be modified subsequently as necessary once the IRS matter was determined).

The IRS next argues that the Counts seeking to strip the IRS lien from individual properties are premature and should be denied on ripeness grounds.  The IRS cites *In re Parker*, 285 B.R. 394 (Bankr. E.D. Tenn. 2002) and *In re Sallis*, 316 B.R. 904 (Bankr. W.D. Ky. 2004) in support of the proposition that a lien avoidance claim is not ripe until a secured claim is paid in full. Those cases are inapposite here because they were both Chapter 13 cases in which debtors had proposed plans with provisions for  early release of liens once the secured claim was paid even though the plan was not yet completed, and the affected creditors had objected. In other words, the debtors in those cases were not seeking to modify a lien pursuant to *Section 1123(b)(5)* of the Bankruptcy Code, and additionally the affected creditors had objected to the early release provisions in the proposed plans.  If *Section 1123(b)(5)* could not be invoked until a secured claim was paid in full it would be purely illusory – what good would the ability to modify the rights of holders of a secured claim in a Chapter 11 plan be if it could not be used until after the secured claim was paid in full? By the time that happens  the creditor is under an obligation to release the lien anyway.  The IRS argument also fails to explain how under its theory the debtor in *Johnson* was able to secure the removal of the IRS lien from his property  while his plan was still ongoing.

Finally, the IRS argues that its lien cannot be stripped off the properties because the underlying tax debt is nondischargeable.   The IRS has cited three cases in support of this

33

proposition, *In re Borck*, 81 B.R. 142 (Bankr. S.D. Fla. 1987); *In re Schneider*, 2011 WL 66045

(Bankr. N.D. Cal. , Jan. 10, 2011); and, *In re Frengel*, 115 B.R. 569 (Bankr. N.D. Ohio 1989). The

Court has reviewed these cases and does not find *Borck* or *Frengel* to be on point.  *Borck* was a

Chapter 7 case in which the debtor sought to have tax obligations to the IRS held to be dischargeable

and to avoid the associated lien as a preference under *11 U.S.C. §547*.  While the *Borck* court

disallowed avoidance of the lien,  it did so not on the basis that the tax debt was nondischargeable,

but rather because it found that the tax lien was a "statutory lien" and thus not avoidable as a

preference pursuant to *Section 547(c)(6)*.  *Frengel* was a Chapter 7 case in which the debtor sought

to avoid IRS liens pursuant to *Sections 522(f)* (lien that impairs an exemption), which is not involved

in the present case.

     The *Schneider* case, while  distinguishable from the present case in that it was under

Chapter 13, does require further consideration.  In that case the debtors alleged that the value of their

house was less than they owed on the first mortgage on the property and they sought an order

valuing three subsequently-filed California tax liens at $0 and avoiding the liens upon completion

of their chapter 13 plan.  *2011 WL 666045.*  Noting that at least some of the taxes secured by the tax

liens appeared to be nondischargeable, although dischargeability had yet to be determined, the

Schneider court stated:

> A tax lien may be valued pursuant to § 506(a) as part of a plan of
> reorganization .... However, valuing a lien for plan purposes is very
> different from avoiding or "stripping" the lien. Section 506(a) can be
> used to permanently remove a lien only to the extent that the lien
> secures a dischargeable debt.

*Id.* at *1.  The court therefore valued the tax liens at $0 for plan purposes, but refused to avoid the

liens unless and until it was determined in an adversary proceeding that they secured tax debt that was dischargeable.

The *Schneider* court cited to no authority and provided no analysis in support of its blanket statement that *Section 506(a)* may be used to permanently remove a lien only to the extent that the lien secures a dischargeable debt, and in fact it acknowledged the existence of cases holding to the contrary. *See id*. at n.1 ("Some bankruptcy courts have held that a discharge is not necessary to permanently strip a lien. *See, e.g., In re Tran*, 431 B.R. 230, 235 (Bkrtcy. N.D. Cal. 2010). However, even applying the reasoning of those courts a tax lien would immediately re-attach after bankruptcy to the extent it secured nondischargeable taxes."). Despite the absence of any support provided by the *Schneider* court for its conclusion regarding *Section 506(a)*, if its statement of law is correct that might prevent the Debtor from stripping the IRS lien in the present case because under the *Johnson* case, *Section 506(a)* is an integral part of the lien avoidance process being used herein, and because the Court has now determined that the Debtor's tax debt to the IRS is nondischargeable under *11 U.S.C. §523(a)(1)(C)*. For that reason this issue is one deserving of further inquiry beyond the material provided by the IRS.

The Court first notes that nothing in *Section 506(a)* itself gives any indication that the claim bifurcation process it creates is restricted for use only with respect to claims that are dischargeable in the bankruptcy case.[15] The Court is reluctant to read such a restriction into the statute when there is no apparent reason for doing so. Likewise, there is nothing in the controlling

---

[15] There is also nothing in *Section 1123(b)(5)* indicating that the modification of secured claims as allowed therein is limited only to secured claims that are dischargeable.

*Johnson* decision which provides any indication that the IRS tax lien avoidance process approved therein is only available with respect to dischargeable tax debt.

The case of *In re Berkebile*, 444 B.R. 326 (Bankr. W.D. Pa. 2011), which was decided following *Johnson*, is also instructive.  The debtor in that individual Chapter 11 case sought to strip an IRS lien from a parcel of property  pursuant to *Sections 506* and *1123(b)(5)*.  The debtor conceded that the taxes at issue were nondischargeable under the Bankruptcy Code.  *Id*. at 333.  Despite that concession, the *Berkebile* court found that the debtor could  still  utilize  the  lien avoidance process, stating:

> Our determination that the Debtor may bifurcate the secured claim of the IRS on the Bethel Park Property under §§ 506(a) is a legal determination authorized by the Bankruptcy Code that does not affect any rights the IRS may have to assess or collect its nondischargeable taxes from the Debtor. The fact that the unsecured portion of the lien is void occurs by operation of law under § 506(d). Entering an order memorializing the result of § 506(d) is merely a ministerial act of the court done in order to fulfill Congress' intent. As previously explained in this Memorandum Opinion, we are making no determination as to what can be collected. Rather, we find that the Debtor may make use of Bankruptcy Code provisions enacted by Congress for the express purpose of determining the value of assets encumbered by secured claims and voiding any liens to the extent the value in the collateral does not support them.

*Id.  See also e.g., In re Dembo*, 126 B.R. 195, 202 (Bankr. E.D. Pa. 1991) (rejecting position that lien avoidance is only available as to dischargeable tax debt, court stating:

> Avoiding a lien or a portion of a lien which otherwise attaches to specific property is a completely different concept from ... survival of non-dischargeable debts ...  It is not the function of a bankruptcy court to speculate about and rule upon all of the potential rights which might be invoked against debtors after a bankruptcy case has

ended, such as the rights of IRS in collecting a nondischargeable
debt. The important issue in deciding a §506 issue is what the rights
of the secured parties are as to certain specific property of the debtor
as of a particular date ....

The Court therefore concludes that the nondischargeability of the Debtor's tax debt

to the IRS does not prevent lien avoidance. Questions about the nature of the relationship that will

exist between the Debtor and the IRS should the bankruptcy conclude without the tax debt having

been fully paid, and the rights of the IRS concerning collection of the remaining debt in such

circumstances, are speculative, not before the Court at this time, and not germane to the Court's

decision.

There is one final matter that must be addressed before concluding, that being the

treatment of the IRS liens as to the 3 Chesterfield properties. As was indicated above, for purposes

of this matter, Nextier Bank has a lien of $92,720.60 on each of the Chesterfield properties, but

which liens represent only a single debt of that amount. In the Court's view, if the full amount of

each such lien were simply "credited" as to each of those 3 parcels in a mechanical manner it would

result in a distorted calculation that would unfairly benefit the Debtor and unfairly harm the IRS.

After giving the matter considerable thought, the Court has concluded that the best

way to address the three Chesterfield properties in the context of this case is to treat the  properties

as a group, rather than individually, and to find that the IRS has a lien on the group of properties

with a total value of $279,297.42.  This seems preferable to viewing the Chesterfield properties

individually and retaining the full value of the Next Tier Bank lien as to each property, which would

be unfair to the IRS, or somehow attempting to apportion the Next Tier bank lien among the

properties, which would be impossible given the uncertainty of future events concerning the properties. The Court believes it has the authority to treat the Chesterfield properties on a group basis as a means of avoiding unfairness and uncertainty. *See e.g., In re Kaiser Aluminum Corp.* 456 F.3d 328, 340 (3d Cir. 2006) ("Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process .... To this end, they may, when necessary, 'eschew mechanical rules'," citing cases). The IRS $279,297.42 lien on the Chesterfield properties can then be adjusted as necessary depending on future events.

For instance, and referring back to the chart on Page 27, if the property at 155 Chesterfield were to be sold first the IRS would not be entitled to any of the sale proceeds, but its $279,297.42 lien would still apply in full to the remaining two properties (which would be free of the Next Tier Bank lien following the sale of the property and payment to Next Tier Bank). On the other hand, if the 145 Chesterfield property were to be sold first, the IRS would be entitled to a payment of $67,279.40 from the sale proceeds, reducing its lien to $212,018.02 on the remaining two Chesterfield properties. Based on this explanation, the Court is hopeful that the Debtor and the IRS will cooperate in good faith to recognize and agree on adjustments to the lien based on future events, but as a precaution it will retain jurisdiction to hear and decide any disputes between the Parties concerning the IRS lien on the Chesterfield properties should that become necessary.

The Court therefore finds that there is no equity available to support the IRS tax lien as to the properties located at 1132 SE Kings Bay Drive (Count X) and at 731 Rosedale (Count XI), so the IRS lien will be completely stripped off those properties. As for the Chesterfield properties (Counts VI - VIII), the Court finds that they are to be treated as a group for purposes of determining

the amount of the IRS lien, and that the IRS lien as to such group will be stripped down to a

collective amount of $279,297.42, subject to adjustment based on future events.[16]

An appropriate judgment order as to all issues will be filed separately.

Dated: October 5, 2021

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
    Aurelius Robleto, Esq.
    Alexander Kalyniuk, Esq.
    Elizabeth Bruce, Esq.
    Jill Locnikar, Esq.
    Debtor

---

[16] It was discussed earlier that two other real properties owned by the Debtor, those involved in Counts V and IX, were sold during the course of this bankruptcy and that the IRS lien as to them was transferred to the proceeds of the sale. *See* pp. 4–5, *infra*. Since those properties have been sold the issue of stripping the IRS lien from them is moot insofar as this adversary proceeding is concerned. If the Parties have a dispute as to the extent and effect of the IRS lien with respect to the sale proceeds currently being held by Debtor's attorney they are free to invoke the Court's involvement therein by an appropriate filing.